**Gen. 101]** 101

**FIREARMS**

REGULATED FIREARMS – ASSAULT WEAPONS – WHETHER A WEAPON IS A "COPY" OF A DESIGNATED ASSAULT WEAPON AND THEREFORE SUBJECT TO THE REGULATED FIREARMS LAW

May 24, 2010

*Colonel Terrence B. Sheridan*
*Superintendent, Maryland State Police*

You have asked for an interpretation of the part of Maryland's regulated firearms law that describes the weapons covered by that law. The statutory definition of "regulated firearm" specifies a list of designated assault weapons "or their copies." You have asked for our opinion on the meaning of the word "copies" in that context.

In our opinion, to come within the definition of "regulated firearm," a copy of a designated assault weapon must be similar in its internal components and function to the designated weapon. Cosmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law.

**I**

**Assault Weapons as "Regulated Firearms"**

The State's regulated firearms law governs the possession, sale, and transfer of certain weapons. Annotated Code of Maryland, Public Safety Article ("PS"), §5-101 *et seq*. Under that law, for example, an individual may be disqualified from obtaining a regulated firearm for various reasons – *e.g.,* conviction of certain crimes. *See* PS §5-134. Accordingly, an individual seeking to purchase, rent, or transfer a regulated firearm must submit an application for review and approval of the transaction by the Department of State Police. PS §5-117 *et seq.*

The statute defines "regulated firearm" to include two categories of firearms. The first category is handguns. PS §5-101(p)(1). The second category consists of "a firearm that is any of

the following specific assault weapons *or their copies, regardless of which company produced and manufactured that assault weapon...*" PS §5-101(p)(2) (emphasis added). The statute then identifies specific assault weapons, listed by manufacturer and model. *Id.*[1]

---

[1] The statute lists the following assault weapons:

|        |        |
|--------|--------|
| (i)    | American Arms Spectre da Semiautomatic carbine; |
| (ii)   | AK-47 in all forms; |
| (iii)  | Algimec AGM-1 type semi-auto; |
| (iv)   | AR 100 type semi-auto; |
| (v)    | AR 180 type semi-auto; |
| (vi)   | Argentine L.S.R. semi-auto; |
| (vii)  | Australian Automatic Arms SAR type semi-auto; |
| (viii) | Auto-Ordnance Thompson M1 and 1927 semi-automatics; |
| (ix)   | Barrett light .50 cal. semi-auto; |
| (x)    | Beretta AR70 type semi-auto; |
| (xi)   | Bushmaster semi-auto rifle; |
| (xii)  | Calico models M-100 and M-900; |
| (xiii) | CIS SR 88 type semi-auto; |
| (xiv)  | Claridge HI TEC C-9 carbines; |
| (xv)   | Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle; |
| (xvi)  | Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2; |
| (xvii) | Dragunov Chinese made semi-auto; |
| (xviii)| Famas semi-auto (.223 caliber); |
| (xix)  | Feather AT-9 semi-auto; |
| (xx)   | FN LAR and FN FAL assault rifle; |
| (xxi)  | FNC semi-auto type carbine; |
| (xxii) | F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; |
| (xxiii)| Steyr-AUG-SA semi-auto; |
| (xxiv) | Galil models AR and ARM semi-auto; |
| (xxv)  | Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3; |
| (xxvi) | Holmes model 88 shotgun; |
| (xxvii)| Avtomat Kalashnikov semiautomatic rifle in any format; |
| (xxviii)| Manchester Arms "Commando" MK-45, MK-9; |
| (xxix) | Mandell TAC-1 semi-auto carbine; |
| (xxx)  | Mossberg model 500 Bullpup assault shotgun; |

(continued...)

The statute does not further define the word "copies" in this context.

## II

## Analysis

You have asked for an interpretation of the regulated firearms statute. The goal of statutory construction is to discern and carry out the intention of the Legislature. *See, e.g.*, *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 549-50, 769 A.2d 948 (2001). While legislative intent is generally derived from the words of the statute, "external manifestations" or "persuasive evidence," including amendments that occurred as a bill passed through the Legislature, the bill's relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goals, may be considered. *Id*.

### A. *Statutory Language*

As indicated above, the statute defines "regulated firearm" to encompass a list of specific firearms, "or their copies, regardless of which company produced and manufactured that assault weapon." You state that there has been disagreement about whether a copy in

---

[1] (...continued)

| | |
|---|---|
| (xxxi) | Sterling Mark 6; |
| (xxxii) | P.A.W.S. carbine; |
| (xxxiii) | Ruger mini-14 folding stock model (.223 caliber); |
| (xxxiv) | SIG 550/551 assault rifle (.223 caliber); |
| (xxxv) | SKS with detachable magazine; |
| (xxxvi) | AP-74 Commando type semi-auto; |
| (xxxvii) | Springfield Armory BM-59, SAR-48, G3, SAR-3, -21 sniper rifle, M1A, excluding the M1 Garand; |
| (xxxviii) | Street sweeper assault type shotgun; |
| (xxxix) | Striker 12 assault shotgun in all formats; |
| (xl) | Unique F11 semi-auto type; |
| (xli) | Daewoo USAS 12 semi-auto shotgun; |
| (xlii) | UZI 9mm carbine or rifle; |
| (xliii) | Valmet M-76 and M-78 semi-auto; |
| (xliv) | Weaver Arms "Nighthawk" semi-auto carbine; or |
| (xlv) | Wilkinson Arms 9mm semi-auto "Terry." |

this context would mean a firearm with internal functions and mechanisms similar to an enumerated firearm or would extend to a firearm that is simply similar in appearance to one of the enumerated weapons.

Other than to indicate that there is no special limitation as to the maker of a copy, the definition of "regulated firearm" does not resolve this debate. Nor does the statute expressly define "copies." A common dictionary definition states that a "copy" is "a reproduction or imitation of an original." Webster's II New College Dictionary (1995) at p. 249; *see also* <http://dictionary.reference.com/browse/copy>. What must be reproduced or imitated to create a "copy" in this context? Other parts of the statute offer some clues.

The statute defines "firearm" to mean, among other things, "the frame or receiver" of a weapon that "expels ... a projectile by the action of an explosive." PS §5-101(h)(1)(ii). This suggests that the Legislature deemed the frame or receiver[2] as a distinctive component of a firearm. Presumably, a "copy" of a firearm would incorporate a reproduction or imitation of the frame or receiver of that firearm. Thus, an analysis of whether the frame or receiver of a given firearm are similar to the frame or receiver of an enumerated firearm would appear to be one criterion that could be considered in determining whether a firearm is a "copy" of an assault weapon.

The list of assault weapons in the statute that would be the subject of any "copy" suggests that cosmetic similarity alone would not suffice. For example, three of the firearms listed in PS 5-101(p)(2)[3] are described by specific calibers. The specification of

---

[2] The State firearms law does not define "frame or receiver." Federal law, which contains a similar definition of "firearm," defines "frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechlock, and firing mechanism, and which is usually threaded at its forward position to receive the barrel." 27 CFR §478.11.

[3] *See* PS §5-101(p)(2)(xviii) (Famas semi-auto (.223 caliber)); PS §5-101(p)(2)(xxxiii) (Ruger mini-14 folding stock model (.223 caliber)); and PS §5-101(p)(2)(xxxiv) (SIG 550/551 assault rifle (.223 caliber)).

the caliber indicates that an otherwise identical weapon of a different caliber would not be a regulated firearm.[4]

These textual clues indicate that it is not merely the appearance of a weapon, but its internal components and function, that determine whether the weapon is a copy of a listed weapon. Ultimately, that determination must be guided by the legislative purpose in regulating copies. We turn to the legislative history of the regulated firearms law for a fuller understanding of why the General Assembly included "copies" in this definition.

## B.  *Legislative History of Definition of "Assault Weapon"*

The reference to "copies" originally entered the firearms law as part of a definition of "assault weapon" in a statute regulating assault weapons. That definition was later consolidated with a reference to handguns to create the current definition of "regulated firearm."

### *Definition and Regulation of "Assault Weapons"*

The precursor of PS §5-101(p) was enacted in 1989 as part of the original legislation regulating assault weapons. In that year, bills were introduced to prohibit the sale, transfer, importation, possession, or purchase of assault weapons, except in narrowly defined circumstances. Senate Bill 531 (1989) and House Bill 1118 (1989). The proposed definition of "assault weapon" in the original bills included several generic descriptions: any semi-automatic rifle or semi-automatic handgun that would accept a detachable magazine with a capacity of 20 rounds or more; a shotgun with a magazine capacity of 6 rounds or more; any part, or combination of parts, designed or intended to readily convert a firearm into an assault weapon. *See* Senate Bill 531 (1989), first reader; House Bill 1118 (1989), first reader. It also included a list of eight specific firearms, "or their copies regardless of which company produced that firearm." *Id.*

---

[4] By contrast, the federal assault weapon law, enacted in 1994, defined "semiautomatic assault weapon" to include a list of nine specific firearms, "or copies or duplicates of the firearms in any caliber." 18 U.S.C. §921(a)(30)(A). The federal semiautomatic assault weapons law expired in 2004. *See* Pub.L. 103-322, Title XI, §110105(2), 108 Stat. 2000 (September 13, 1994).

The reference to "copies" in the original bills thus pertained only to the specifically-named firearms, not to the generically-described weapons. Presumably, a reference to "copies" was not included for the generic categories because it was considered unnecessary; the generic categories already included *any* weapon meeting the specified criteria, thus encompassing any weapons that had similar internal components and function, but not necessarily weapons with only superficial similarities. If the term "copies" was understood to refer to cosmetic similarities, the definition in the original bills would have reached superficial imitations of only eight weapons, but not of the majority of assault weapons covered by the generic descriptions. Therefore, it seems clear that the term "copies" in the original bills was not intended to mean "look alike." More likely, the reference to "copies" of specific weapons was intended to ensure that the requirements of the law could not be avoided simply by rebranding or superficially changing a named weapon. This also suggests that "copies" was intended to relate to components and function, not simply appearance.

The proponents of the bills testified that the legislation was intended to limit the availability of military style assault weapons and other anti-personnel firearms. *See* Testimony of Delegate Peter Franchot concerning House Bill 1118. However, concerns were expressed that the proposed definition of "assault weapon" in the bills was too broad and might encompass "legitimate sporting, hunting, and recreational arms." *See, e.g.*, Letter of Colonel Leonard J. Supenski to Delegate Robert L. Flanagan concerning House Bill 1118 (February 19, 1989) ("Supenski Letter"); Testimony of Izaak Walton League concerning House Bill 1118.

With assistance from Maryland law enforcement officials, the proponents developed amendments to the bills to "provide a workable bill which balances the rights of hunters and sportsmen with the right of the public to be protected from the proliferation of such anti-personnel firearms." Supenski Letter; *see also* Letter of Delegates John Gary and Peter Franchot (February 22, 1989). The amendments deleted the generic language in the definition of "assault weapon" and, instead, expanded the list of named weapons to 24 enumerated firearms "or their copies regardless of which company produced and manufactured that firearm." The amendments also provided that the sale or transfer of assault weapons would be regulated in the same manner as the sale or transfer of pistols and revolvers and directed the State Police to adopt regulations for that purpose. The House version of the bill received an unfavorable report, but the Senate version, as thus

amended, was enacted as Chapter 293, Laws of Maryland 1989. The new assault weapons law, including that definition, was codified at Annotated Code of Maryland, Article 27, §481E.[5]

Thus, the apparent compromise that was struck to achieve passage of the bill was to eliminate the generically-described categories and limit the range of weapons subject to the new law to "copies" of specifically-named weapons. Given the objections to the original proposed definition, it seems unlikely that the General Assembly contemplated that a superficial similarity alone to a listed gun would suffice to bring a weapon within the statute. Instead, it limited the reach of regulation to weapons that functioned in a very similar manner.

*"Assault Weapons" Included in the Definition of "Regulated Firearm"*

In 1996, the Legislature further tightened regulation of assault weapons and handguns in the Maryland Gun Violence Act of 1996. Chapters 561, 562, Laws of Maryland 1996. As part of that legislation, the term "regulated firearm" was added to the law to encompass both assault weapons and handguns. The definition of "assault weapon," newly codified in Article 27, §441(d), contained the same list of specific weapons as the prior version and continued to include "copies" of the listed firearms, "regardless of which company produced and manufactured that firearm." As originally drafted, the bill would have expanded the list of enumerated weapons to include "any other firearm defined as an assault weapon by federal law"; however, that provision was amended out of the final versions of the bills.

In 2003, as part of the code revision process, the regulation of firearms was recodified in the new Public Safety Article. As part of that revision, the definition of "assault weapon" was incorporated into the definition of "regulated firearm," in new PS §5-101(p). Minor changes in the wording of the definition were not intended to

---

[5] In 1994, the Legislature revised the list of specific firearms set forth in the definition of "assault weapon." Chapter 456, Laws of Maryland 1994. As part of that revision, the legislation removed from the list certain assault pistols that were otherwise being banned under other provisions of that legislation; the bill also added to the list other assault weapons "that have come into existence since the creation of the list." Senate Floor Report for Senate Bill 619 (1994). The statute continued to cover "copies" of all listed firearms.

effect any substantive change. *See* Chapter 5, §2, Revisor's Note, Laws of Maryland 2003 at p. 211.

### C.   Summary

While the regulated firearms law does not define "copy," the statutory definition of "firearm" and the specifications in the list of named assault weapons both suggest that a weapon must have more than a cosmetic similarity to be a "copy." Moreover, in enacting and amending the law regarding "assault weapons," the General Assembly has rejected attempts to define "assault weapons" broadly, based on general characteristics or a reference to the more inclusive federal definition. Instead, it has chosen to establish a list of specific weapons, and in some cases, specific calibers. Interpreting "copy" to include any firearm that merely looked like one of the enumerated firearms would run contrary to the choices made by the Legislature.

As the proponents of the original 1989 legislation indicated when they crafted the amendments to achieve its passage, the purpose of listing specific weapons and their "copies" was to distinguish "anti-personnel" assault weapons from firearms used by hunters and sportsmen that might fall within a more generic definition. Consistent with the General Assembly's apparent intent to create a definition with an eye toward the function of the weapon, a "copy" would include a firearm whose internal components and function, necessary to the operation of the firearm, are similar to those of one of the specifically enumerated assault weapons. As the agency charged with administering the regulated firearms law, the Department of State Police must make that assessment.

### III

### Conclusion

For the reasons set forth above, it is our opinion that the reference to "copies" in PS §5-101(p)(2) does not extend the regulated firearms law to weapons that bear a mere cosmetic similarity to a listed weapon. Rather, in order for a firearm to be considered a copy of a listed assault weapon, and therefore governed by the regulated firearms law, there must be a similarity between the internal components and function of the firearm in question and those of one of the listed weapons. A determination as to whether

a particular firearm bears such similarity is a factual question entrusted in the first instance to the Department of State Police.

Douglas F. Gansler
*Attorney General*

Mark H. Bowen
*Assistant Attorney General*

Robert N. McDonald
*Chief Counsel*
  *Opinions and Advice*



# BALTIMORE COUNTY POLICE DEPARTMENT

400 KENILWORTH DRIVE
TOWSON, MARYLAND 21204-4007
(301) 494-2214

Cornelius J. Behan
CHIEF OF POLICE

February 19, 1989

Honorable Robert L. Flanagan
226 Lowe House Office Building
Annapolis, Maryland  21401

RE:  Assault Weapons:  H.B. 1118 - Law Enforcement Recommended Amendments

Dear Delegate Flanagan:

As I said during my testimony concerning H.B. 1118, we in Maryland's Law Enforcement Community agreed with the Bill's concept but stated it needed amending to provide:

o  A grandfather clause

o  A generic protection for legitimate sporting, hunting and recreational arms

o  A specific list of guns to be prohibited.

The attached amendments provide a workable Bill which balances the rights of hunters and sportmen  with the right of the public to be protected from the proliferation of such anti-personnel firearms.

Sincerely,

Colonel Leonard J. Supenski
Chief
Crime Prevention Bureau
Baltimore County Police Department
7209 Belair Road
Baltimore, Maryland  21206
(301) 887-5335

LJS:jlg

cc:  Members of the House Judiciary Committee
     President of the Maryland Chiefs of Police Association
     President of the Maryland Sheriffs' Association



HB1118

BY:   Delegate
(To be offered to the Judiciary Committee)

AMENDMENTS TO HOUSE BILL NO. 1118
(First Reading File Bill)

AMENDMENT NO.
        On page 1, line 20, strike "(1)"; and on pages 1 and 2,
strike beginning with "(I)" in line 21 on page 1, down through
"CARBINE" in line 19 on page 2, and substitute:

        "(1) ANY OF THE FOLLOWING SPECIFIC FIREARMS OR THEIR COPIES
REGARDLESS OF WHICH COMPANY PRODUCED AND/OR MANUFACTURED THAT
FIREARM:

        (I)         UZI 9MM IN ANY FORMAT (MICRO, CARBINE, RIFLE);

        (II)        HECKLER AND KOCH HK 91 A3 (.308 CALIBER); 93-A
(.223 CALIBER;

        (III)       GALIL 5.56MM AND 7.62MM;

        (IV)        FN LAR ASSAULT RIFLE/BATTLE RIFLE IN ANY FORMAT:
PARA 50.63 (.308 CALIBER), PARA 50.64; HB FALO 50.41 (.308
CALIBER); OR FN-FAR-HB FALO 50.42;

        (V)         SPRINGFIELD ARMORY SAR-48 (.308 CALIBER) IN ANY
FORMAT:

        (VI)        MANDELL TAC-1 CARBINE IN 45 ACP OR 9MM;

        (VII)       COLT AR 15 IN ANY FORMAT;

        (VIII)      FNC .223 CARBINE;

        (IX)        AVTOMAT KALASHNIKOV SEMIAUTOMATIC RIFLE IN ANY
FORMAT:

        (X)         CALICO M 900 9MM ASSAULT RIFLE;

        (XI)        SIG 550/551 ASSAULT RIFLE (.223 CALIBER);

        (XII)       MAC 10-11 IN ANY FORMAT;

        (XIII)      INTRATEC TEC 9 AND TEC 9M;

        (XIV)       COBRAY SWD 9MM IN ANY FORMAT;

        (XV)        FAMAS 5.56MM (.223 CALIBER);

        (XVI)       MOSSBERG MODEL 500 BULLPUP ASSAULT SHOTGUN;

(XVII)    USAS-12 SEMI-AUTO ASSAULT SHOTGUN;

(XVIII)   FEATHER CENTERFIRE AT-9 SEMI-AUTO;

(XIX)     STEYR-AUG-SA SEMI-AUTO (.223 CALIBER);

(XX)      VALMET M-76 AND M-78 IN ALL FORMATS;

(XXI)     STERLING MK 6 CARBINE SEMI-AUTO 9 MM;

(XXII)    BARRETT LIGHT .50 CALIBER SEMI-AUTO;

(XXIII)   ARGENTINE L.S.R. SEMI-AUTO IN ALL FORMATS;

(XXIV)    DRAGUNOV SNIPER RIFLE (7.62 X 39MM);

(XXV)     AP 9 ASSAULT PISTOL;

(XXVI)    STRIKER 12 ASSAULT SHOTGUN IN ALL FORMATS;

(XXVII)   THOMPSON ORDNANCE M1 IN ALL FORMATS; AND

(XXVIII)  RUGER MINI-14 FOLDING STOCK MODEL (.223 CALIBER).

(2) ANY DETACHABLE MAGAZINE FOR A SEMI-AUTOMATIC RIFLE OR HANDGUN WITH A CAPACITY OF 20 ROUNDS OR MORE.".


AMENDMENT NO.
On page 2, line 20, strike "(3)" and substitute "(B)"; and on page 2, strike beginning with "A:" in line 20, down through "(III)" in line 23; and on page 2, strike beginning with "OR" in line 24 down through "SUBSECTION" in line 26.


AMENDMENT NO.
On page 2, line 27, strike "(B)" and substitute "(C)"; and on page 3, line 1, strike "(C)" and substitute "(D)".

HB1118

BY: Delegate
(To be offered to the Judiciary Committee)

## AMENDMENTS TO HOUSE BILL NO. 1118
### (First Reading File Bill)

AMENDMENT NO.
    On page 2, line 35, following "PURPOSES." insert:

"(3) NOTHING IN THIS SECTION SHALL BE CONSTRUED TO MAKE UNLAWFUL THE POSSESSION OF ANY ASSAULT WEAPON IDENTIFIED IN SUBSECTION (A) BY A PERSON WHO TOOK POSSESSION, PURCHASED, TRANSPORTED INTO THE STATE OR RECEIVED THE ASSAULT WEAPON PRIOR TO THE EFFECTIVE DATE OF THIS ACT.".





# HOUSE OF DELEGATES
ANNAPOLIS, MARYLAND 21401-1991

February 22, 1989

Dear Colleague:

Thank you for your interest in House Bill 1118 which was designed to restrict future sales of assault weapons in Maryland. We discovered in our research and throughout the Judiciary Committee hearing that the bill, in its original form, was too broad. Therefore, under the guidance of the law enforcement community, we drafted amendments that would narrow the legislation.

Specifically, the proposed amendments listed actual assault weapons which would be restricted and deleted the generic definition. Further, the amendments explicitly stated that all present gun owners' weapons would be "grandfathered" so that anyone already owning an assault weapon at the time this law was enacted would be able to keep their weapon. We have attached a copy of these amendments for your files.

Unfortunately, these amendments - and, therefore, the bill- were defeated in the House Judiciary Committee this morning by a vote of 10 to 11.

However, the problem still needs to be solved. These weapons are proliferating at an alarming rate. For example, in 1986, approximately 8,100 AK-47's were imported into the United States. In 1988, that number exploded to over 80,000 and, by next session, twice that many more will have been imported.

Presently, there is a similar bill in the Senate that is scheduled to have a hearing in the Judicial Proceedings Committee on March 9, and the House Judiciary Committee has already committed to a summer study of this legislation. We are confident we will have action on these terrible weapons within a year, and hope you will support this effort.

Sincerely,

John Gary

Peter Franchot

-1-